Robert L. KEITH, Appellant,

v.

STATE of Alaska, Appellee.

No. 4003.

Supreme Court of Alaska.

May 30, 1980.

Walter Share, Asst. Public Defender, and Brian Shortell, Public Defender, Anchorage, for appellant.

David Mannheimer, Asst. Atty. Gen., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

RABINOWITZ, Chief Justice.

Robert Keith was indicted for the second degree murder [1] of Nicholas Krivitsky. Af-

1. At the time of this offense, AS 11.15.030 provided:

*Second degree murder.* Except as provided in §§ 10 and 20 of this chapter, a person

ter a jury trial, at which it was undisputed that Keith shot and killed Krivitsky, he was convicted of manslaughter.[2] From this conviction, Keith raises five issues on appeal.

He claims error in the misstatement of fact and alleged material misrepresentation in the grand jury proceeding, alleged prosecutorial misconduct and objections as to both the giving and failure to give certain instructions. We find the exclusion of the victim's journal and the giving of an instruction upon the defendant's bad character to be errors, requiring a new trial.

## I. BACKGROUND FACTS

On April 22, 1977, Robert Keith and a companion, Darlene Nelson, picked up a hitchhiker named Nicholas Krivitsky as they were driving out of Homer on their way to Anchorage. They stopped at the Anchor Inn on the way and all had breakfast. After breakfast, the three had drinks in the bar and took two six packs of beer and a pint of whisky with them. All three sat in the front seat of the car and were drinking heavily as they proceeded north toward Anchorage. Darlene either fell asleep or passed out from the alcohol on Keith's shoulder. She remembers nothing of the events which subsequently transpired, except that she awoke at one point hearing loud voices, but was almost immediately knocked out by a blow to the face. The blow came during an argument between Keith and Krivitsky. Shortly thereafter, Keith shot and killed Krivitsky.

Keith was the only witness to the shooting. Two other people who were driving by the turnout where the shooting occurred testified to seeing portions of the incident but no one witnessed the actual shooting. As to the events that led up to the shooting, Keith testified as follows.

During the drive Krivitsky began to behave strangely, becoming withdrawn, and

he removed a .22 pistol which Darlene kept in the glove compartment of her car. When Keith asked him where the gun was, Krivitsky denied all knowledge of it, but Keith later noticed the gun in Krivitsky's hands and took it away from him. At that point, there was an argument which ended with Krivitsky getting in the back seat, upon Keith's insistence. Keith placed the .22 pistol on the seat beside him only to notice that it was missing again a short while later. Krivitsky said that he had dropped the pistol out the window but Keith did not think he could have done so without him noticing. Keith next noticed Krivitsky in the back seat with a .44 magnum which Keith owned and .44 shells in his hands. Keith attempted to take the gun away from Krivitsky with one hand while he continued driving using the other hand. During the struggle over the gun, Darlene was knocked out but Keith did manage to get the gun away from Krivitsky and into the front seat with him. Keith then pulled off the road into a turnout and ordered Krivitsky out of the car. They eventually engaged in another struggle over the gun outside the car which ended with Krivitsky on the ground and Keith standing over him pointing the .44 at him. Keith did not remember how the revolver became cocked, but he apparently attempted to uncock it, stepping back away from Krivitsky, and Krivitsky kicked him, causing the gun to go off. Keith testified that he did not realize Krivitsky had been shot in the head and killed until after it happened. Keith dragged the body to a nearby embankment and dumped it over the edge; then he returned to the car to check on Darlene. He testified that he was attempting to take her to a hospital in Soldotna when he was stopped at a road block a short while later and arrested. The .22 pistol was never recovered, but the .44 magnum was found in the car when Keith was arrested.

---

who purposely and maliciously kills another is guilty of murder in the second degree, and shall be sentenced to imprisonment for a term of not less than 15 years to life.

2. At the time of this offense, AS 11.15.040 read:
 *Manslaughter.* Except as provided in § 10–30 of this chapter, a person who unlawfully kills another is guilty of manslaughter, and is punishable by imprisonment in the penitentiary for not less than one year nor more than 20 years.

## II. MISSTATEMENT OF FACT BEFORE THE GRAND JURY

Keith asserts that he was denied the rights to due process of law [3] and an impartial grand jury [4] guaranteed by the Alaska Constitution. Specifically, Keith alleged that there was a material misrepresentation of fact and a failure to present exculpatory evidence to the grand jury. Both claims are based on the inaccurate testimony of a police officer as to the time at which swab samples for detecting the presence of certain materials found in gunshot residue, barium and antimony, were taken from the hands of Keith, Nelson, and Krivitsky.

The swabs were sent to a chemical laboratory for analysis and an analyst from the laboratory testified at the grand jury proceeding as to the results of his tests. He concluded that neither Krivitsky nor Nelson had handled or fired a gun during the period in which the shooting occurred but that Keith had. The negative results on Krivitsky's swab tests were significant because the grand jury had before it statements of Keith that Krivitsky had handled both guns and that the fatal shot had occurred during a struggle over the .44 magnum.

Accuracy of swab test results is dependent on the time at which the swabs were collected since the swab test is unreliable after a certain period of time. Trooper Sumey testified to the grand jury that he ordered another trooper to take the swab test of Krivitsky at the Kenai morgue. Although he was not present for the test, Sumey told the grand jury that the test occurred at 7 p. m. on April 23, approximately four and one-half hours after the shooting. The laboratory analyst testified to the grand jury that there is generally a six-hour maximum for positive test results if the subject is alive and moving about, but that the time period for positive results is much longer, up to a few days, if the subject is dead and the body is not exposed to rain or humidity.

Later, it was discovered that the victim's hands had not been swabbed until sometime between 10:30 and 11:30 p. m., eight or nine hours after Krivitsky's death. Keith's trial attorney discovered the error in the transcript the evening before the omnibus hearing. This matter was brought to the superior court's attention at the omnibus hearing when Keith's counsel moved for dismissal of the indictment. Officer Sumey testified that he only later learned through checking police radio logs that the officers were not at the morgue until approximately four hours later than he had told the grand jury. The superior court denied the motion, stating:

[U]nder the testimony given by the expert witness, Mr. Green, a delay of four hours in conducting the swab tests on a corpse would have little or no significance. Therefore, the misrepresentation which appears to have been inadvertent does not have sufficient materiality to merit dismissal. [citation omitted]

From this ruling Keith appeals, claiming the superior court erred in not finding this to be a material misstatement to the grand jury and a failure on the part of the prosecutor to present exculpatory evidence.

An attack on an indictment has not previously come before this court in exactly this form. However, in *Taggard v. State*, 500 P.2d 238 (Alaska 1972), we considered the related problem of hearsay evidence of questionable reliability presented to a grand jury. The general standards and concerns in evaluating attacks on an indictment, as set forth in *Taggard*, are also appropriate in situations such as the case at bar.

The indictment is the foundation underlying a criminal prosecution. If the indictment is seriously flawed, the conviction cannot stand.

A mere formal defect does not require dismissal of an indictment after the guilt of the defendant has been established at a fair trial. But courts do not hesitate to dismiss an indictment, even after a con-

---

3. Alaska Const. art. I, § 7. *See also* United States Const. amend. XIV.

4. Alaska Const. art. I, § 8. *See also* United States Const. amend. V.

viction, when the defect in the indictment is substantial. The conviction must be overturned when an indictment is invalid and the error was properly preserved by a timely objection prior to trial.[5]

The giving of an inaccurate time regarding the collection of data for the swab test was clearly an error. Since the error was properly preserved at trial, we must next determine whether the defect was substantial. The falsehood in this case seems to have been unintentional.

Alaska Rule of Criminal Procedure 6(q) provides in part:

The grand jury shall find an indictment when all the evidence taken together, if unexplained or uncontradicted, would warrant a conviction . . . .

Therefore, if the unintentional misstatement goes to a nonmaterial fact that would not substantially affect the grand jury's conclusion, it would not be reversible error. When one grand juror specifically asked the expert analyst of the swabs about the six-hour maximum for positive tests results in relation to the deceased, the expert answered as follows:

Six hours is on an individual that is allowed to move around at his own freedom. An individual or a corpse, there is much, much longer time because obviously they're not putting their hands in their pocket, they're not rubbing their hands together, they're not washing their hands or anything. You have much, much longer time even days on a corpse—it just doesn't fly away, it's—there's—unless rain or something washes it, if—he's exposed to environment where there is a large amount of—of humidity or rain of this sort, then you would have a obvious shorter length of time.[6]

■ There was testimony by one of the investigating state troopers that it did not rain at all between the time Krivitsky died and his body was taken to the morgue. Thus, it does not appear from the four-hour difference between the time the grand jury was told the swab tests were taken and the actual time of the tests would have significantly affected the grand jury's assessment of the actions of the deceased in handling the guns as described in Keith's statement. Keith did not claim that Krivitsky had fired either of the guns at any time. Thus, we conclude that there was no material misrepresentation to the grand jury.[7] As to Keith's other grand jury claim that the prosecutor violated his duty to present exculpatory evidence to the grand jury,[8] we find no possible basis for such a claim under the facts of this case. There was no separate exculpatory evidence, and the prosecutor was not shown to have known that the questioned evidence presented to the grand jury was false.

## III. EXCLUSION OF THE VICTIM'S JOURNAL

Krivitsky had kept a journal of his travels for an extensive period of time prior to his death. At trial, Keith attempted to introduce the portions of the journal for the period during which Krivitsky was in Alaska prior to his death. He argued that the journal was relevant to his self-defense claim because they showed a continuing

---

5. *Taggard v. State*, 500 P.2d 238, 243 (Alaska 1972) (footnote omitted).

6. The expert further testified that gunshot residue would be expected to show upon the swab tests, whether the gun was fired or merely handled by the individual being tested, although the residue would be found in different places and amounts on the person's hands in each case.

7. In this case, the grand jury had before it uncontroverted evidence that Keith shot and killed Krivitsky. The primary matter before the grand jury was whether there was evidence to support a finding of the necessary mens rea for second degree murder. We conclude that Trooper Sumey's inaccurate reportage of the time of the swab test was not significant to this determination.

8. American Bar Association Standards Relating to the Prosecution Function and the Defense Function § 3.6(b) provides:

The prosecutor should disclose to the grand jury evidence which he knows will tend to negate guilt.

We do not consider this case appropriate for further delineation of the scope of this duty.

state of mental deterioration in Krivitsky and tendencies toward violent behavior. The superior court refused to admit the journal. Keith specifies this ruling was error, asserting that the ruling violated his constitutional rights to confrontation,[9] compulsory process,[10] and due process of law.[11]

■ Keith's confrontation and compulsory process claims have no merit in the context of this case. As we have observed on many occasions, the essential purpose of the right of confrontation is to protect the accused's interest in being able to test, by cross-examination, the testimony of those appearing against him.[12] The right applies not only to witness testimony, but also to other evidence which the prosecution seeks to introduce against the accused.[13] However, in the present case, the state did not seek to introduce any evidence of the victim's character; it was the defense which raised Krivitsky's possible insanity and potential for violence in the form of the affirmative defenses of justifiable or excusable homicide.[14] Thus, Keith's attempt to

introduce the journal does not serve to "confront" any evidence the prosecution was offering.[15]

The compulsory process claim also fails as inapplicable to the facts of the present case. Compulsory process relates to obtaining both witnesses and documentary evidence in the accused's favor and is intended to ensure a fair trial even when the accused is indigent,[16] but it is normally a right associated with pre-trial discovery.[17] Keith was not denied access to the journal; thus, the remaining issue for this court to address is its admissibility at trial.

■ Keith's due process argument is essentially that the exclusion of the journal affected his ability to present his defense, because it was relevant to show the deceased's mental state and his capacity for violence, and thus tended to support Keith's own testimony about Krivitsky's strange and aggressive behavior prior to the shooting. If the superior court's refusal to admit the journal did, in fact, substantially limit

---

**9.** United States Const. amend. VI; Alaska Const. art. I, § 11.

**10.** *Id.*

**11.** United States Const. amend. XIV; Alaska const. art. I, § 7.

**12.** *See, e. g. Coffey v. State*, 585 P.2d 514, 522 (Alaska 1978); *Lanier v. State*, 486 P.2d 981 (Alaska 1971); *Rubey v. City of Fairbanks*, 456 P.2d 470 (Alaska 1969); *McBride v. State*, 368 P.2d 925 (Alaska 1962).

**13.** *Catlett v. State*, 585 P.2d 553 (Alaska 1978) (right to confront photographs); *Lauderdale v. State*, 548 P.2d 376 (Alaska 1976) (right to confront breathalyzer test ampule).

**14.** *See* former AS 11.15.100; AS 11.15.110. The initial burden of producing evidence which raises a reasonable doubt as to the lack of self-defense rests on the defendant, although the state must ultimately prove the absence of self-defense beyond a reasonable doubt. *De-Groot v. United States*, 78 F.2d 244 (9th Cir. 1935); *State v. Roberts*, 88 Wash.2d 337, 562 P.2d 1259 (1977) (en banc).

**15.** In *Catlett v. State*, 585 P.2d 553 (Alaska 1978), the appellant's right to confrontation claim was rejected for a similar reason. The court stated:

In the case at bar, the pictures [which were destroyed and therefore unavailable for the defendant's use at trial] were not introduced into evidence nor were they utilized at trial nor did officers Sheffield or Coleman prepare their testimony from these pictures. Thus, the foundation for the confrontation and cross-examination rights, i. e., the utilization or introduction of evidence or the taking of testimony based on that evidence, was not present. Hence, Catlett's confrontation argument is without merit.

*Id.* at 557.

**16.** *Braham v. State*, 571 P.2d 631, 644 (Alaska 1977). *See also Johnson v. Johnson*, 375 F.Supp. 872, 876 (W.D.Mich.1974). *See generally* Westen, *The Compulsory Process Clause*, 73 Mich.L.Rev. 71, 125–26 (1974).

**17.** Alaska R.Crim.P. 16 essentially implements the right to compulsory process. Rule 16(a) explains the purposes of pre-trial discovery as follows:

*Scope of Discovery.* In order to provide adequate information for informed pleas, expedite trial, minimize surprise, afford opportunity for effective cross-examination, and meet the requirements of due process, discovery prior to trial should be as full and free as possible consistent with protection of persons, effective law enforcement, and the adversary system.

Keith's opportunities to prove his innocence affirmatively, the due process right to a fair trial would have been denied him.[18] However, we need not determine whether Keith's due process rights were violated, since we have determined that the superior court abused its discretion in excluding this evidence.

The journal contains a rambling account of Krivitsky's travels, personal observations about people he encountered, and his thoughts about himself. It does not lend itself to easy summary, but the portions which the defense sought to introduce do reflect a sense of mental instability, paranoia, hatred of women, and a violent nature. The proffered evidence was clearly relevant as tending to support Keith's testimony as to what occurred prior to the shooting.[19]

█ A trial court has a broad range of discretion in deciding whether to exclude admittedly relevant evidence, based on its assessment of the probative value of the evidence in comparison to a number of countervailing factors.[20] Alaska Rule of Evidence 403 provides:

*Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.* Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.[21]

The superior court indicated that it was disinclined to admit the journal because "absent a better foundation as to what all of that could possibly mean, without a foundation, . . . as a lay jury simply reading those documents, I think would be highly prejudiced."[22]

Our review of the journal leads us to the conclusion that admitting it into evidence would not lead to unfair prejudice. The

---

**18.** *See Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). *See generally* Note, *Constitutional Restraints on the Exclusion of Evidence in the Defendant's Favor: The Implications of Davis v. Alaska,* 73 Mich.L.Rev. 1465 (1975).

**19.** Alaska R. Evidence 401 provides:

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**20.** "This balancing of intangibles—probative values against probative dangers—is so much a matter where wise judges in particular situations may differ that a leeway of discretion is generally recognized." McCormick's Handbook of the Law of Evidence § 185, at 440 (2d ed. 1972) (footnote omitted). *See also State v. Anderson,* 253 S.C. 168, 169 S.E.2d 706, 712, *cert. denied,* 396 U.S. 948, 90 S.Ct. 386, 24 L.Ed.2d 253 (1969); McElroy, *Some Observations Reposed in Trial Judges,* Model Code of Evidence 356 (1942); Slough, *Relevancy Unraveled,* 5 Kan.L.Rev. 1, 12–15 (1956); Trautman, *Logical or Legal Relevancy,* 5 Van.L.Rev. 385, 392 (1952). *But see* Note, *Constitutional Restraints on the Exclusion of Evidence in the Defendant's Favor: The Implications of Davis v. Alaska,* 73 Mich.L.Rev. 1465 (1975).

**21.** *See* McCormick's Handbook of the Law of Evidence § 185, at 439–40 (2d ed. 1972), which

explains several reasons that otherwise relevant evidence may be excluded:

In order of their importance, they are these. First, the danger that the facts offered may unduly arouse the jury's emotions of prejudice, hostility or sympathy. Second, the probability that the proof and the answering evidence that it provokes may create a side issue that will unduly distract the jury from the main issues. Third, the likelihood that *the evidence offered and the counter proof* will consume an undue amount of time. Fourth, the danger of unfair surprise to the opponent when, having no reasonable ground to anticipate this development of the proof, he would be unprepared to meet it. [footnotes omitted]

*See also* Fed.R.Evid. 403 and the advisory committee's note thereto.

**22.** The state argues that Keith's trial counsel did not properly *specify his objections to the* exclusion of the journal to preserve them for this appeal. Our review of the record indicates that the issue was properly preserved in all respects. Defense counsel referred to the portions of the journal which expressed violent thoughts, and the prosecutor argued that the probative value of the journal was outweighed by its prejudicial impact. Other points concerning the corroborative value of the journal were also argued to the superior court.

journal reveals its author, the deceased victim in this case, in a nonfavorable light, but does not do so to the extent that it would arouse the emotions of its reader and divert a jury from its obligations. The excerpts from the journal which Keith sought to admit do clearly portray the character traits mentioned above, and its probative value is such that it outweighs any concern of prejudice, confusion or waste of time. Here Keith was on trial for murder, and there were no witnesses other than Keith to the immediate events preceding the shooting. In such circumstances, Keith was entitled to present his version of the events and evidence supporting it in as full a manner as possible.

The state argues that the subject evidence was cumulative to testimony by several defense witnesses that all reflected on the same character traits of the victim. We disagree. The journal passages are a record of the private thoughts of the victim. They are a different order of evidence than the testimony of several witnesses as to various actions and statements made by the deceased in the months before he met his death. When the character of the victim is so vital to the defendant's version of the events, we do not find such evidence to be cumulative. Rather, exclusion of the journal was prejudicial error. Upon remand for a new trial, such evidence should be received if offered by Keith.

## IV. JURY INSTRUCTION ON BAD CHARACTER

Keith advances as a specification of error the superior court's inclusion of a jury instruction concerning the exclusion of all evidence by the state of Keith's bad character. The questioned instruction read:

The state may not introduce evidence of a defendant's bad character to prove his conduct unless and until a defendant places his own character in question by offering evidence of his good character.

When the defendant in a homicide case has produced evidence that the deceased attacked him, evidence of the deceased's character may be considered on the ques-

tion of whether the deceased was in fact the first aggressor.

It was only after it had unsuccessfully sought to introduce evidence of Keith's bad character that the state requested, over objection, that this instruction be given. The state had argued, when the defense attempted to introduce evidence of Krivitsky's unstable and violent character, that the state had no objection as long as the state was likewise permitted to introduce evidence of Keith's bad character. The superior court ruled that the state was not permitted to make the accused's character an issue unless Keith first made it an issue by introducing evidence of his good character, but that the defense could introduce such evidence of the victim's character. However, the superior court also indicated that it would consider an instruction informing the jury that the state could not introduce evidence of the defendant's bad character under these circumstances. As a result, the above instruction was given.

■ The superior court ruled correctly in allowing in evidence of the victim's character and disallowing any evidence of Keith's bad character. Alaska Rule of Evidence 404(a) provides, in relevant part:

Evidence of a person's character . . is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) *Character of the accused.* Evidence of a relevant trait of his character offered by an accused, or by the prosecution to rebut the same;

(2) *Character of the victim.* Evidence of a relevant trait of character of a victim of a crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor
. . . .

The rule does not suggest that proof of the character of the victim and the accused are interrelated. An accused may offer evidence of a relevant character trait of a victim without its having the effect of

granting to the prosecution the right to introduce evidence of his own character.[23] Thus, we conclude that the jury instruction was a correct statement of the law. However, such an instruction is nonetheless, in our view, erroneous.

■ This instruction brought to the jury's attention what evidence was inadmissible and emphasized the possibility of Keith's bad character, leaving the jury to speculate what evidence was kept from them. The general rationale of the rule against allowing character evidence to be introduced by the prosecutor is that it prevents the jury from convicting someone because he has a propensity to commit a crime or has a past history of criminal activity and not whether he has done the act of which he is accused.[24] It has been more fully expressed as follows:

> The rule is justified primarily on the ground that the probative value of propensity evidence is outweighed by its prejudicial effect on a jury. The introduction of such evidence is said to create

a danger that the jury will punish the defendant for offenses other than those charged, or at least that it will convict when unsure of guilt because it is convinced that the defendant is a bad man deserving of punishment. In addition, it is argued that the jury might be unable to identify with a defendant of offensive character, and hence tend to disbelieve the evidence in his favor. At the least, it is said that such evidence would be given greater probative weight than it deserves, and so lead to convictions on insufficient evidence. Furthermore, saddling a person forever with his record might tend to discourage reformation.[25]

Despite the exception to and qualifications of the character evidence rule contained in the Rules of Evidence,[26] exclusion has substantial validity as a means of protecting the accused from the possibility of a finding of guilty based on a propensity for bad acts.[27] Thus, we conclude that the giving of a jury instruction of this kind, drawing attention to possible prejudicial inad-

**23.** At least in the case of the claim of self-defense, one could plausibly argue under [federal] Rule 404(a)(2) that the evidence of the defendants' character for violence does tend to "rebut" proof of the victim's character offered to prove that he was the first aggressor. There is no evidence that the Advisory Committee ever considered this issue, but the structure of the rule tends to suggest that proof of the character of the accused and of the victim were intended to be separable and that the defendant can attack the character of the victim without exposing his own character to prosecutorial attack. Wright & Graham, Federal Practice and Procedure: Evidence § 5237, at 406 (1978) (footnote omitted). *See generally* Wendorf, *Should Texas Adopt the Federal Rules of Evidence?*, 28 Bay.L.Rev. 249, 255 (1976); Note, *Character Evidence—The Rules of Admissibility in Criminal Cases in Kentucky*, 61 Ky.L.J. 963, 970 (1973). *See also Roberson v. State*, 91 Okl.Cr. 217, 218 P.2d 414 (Okl.Cr.App.1950); 1 Wigmore on Evidence § 63, at 472 (3d ed. 1940 and Supp. 1977); Note, 99 U.Pa.L.Rev. 105 (1950).

**24.** *See generally* Wright and Graham, Federal Practice and Procedure: Evidence § 5232, at 346 (1978); LaFave & Scott, Criminal Law §§ 24–25.

**25.** Note, *Procedural Protections of the Criminal Defendant—A Reevaluation of the Privilege Against Self-Incrimination and the Rule Ex-*

*cluding Evidence of Propensity to Commit Crime*, 78 Harv.L.Rev. 426, 436 (1964) (footnote omitted).

**26.** *See generally* 2 Weinstein's Evidence ¶ 404[04], at 404–25 to 404–27 (1979).

**27.** For example, the policy embodied in the rule was responsible for the reversal of the defendant's conviction in *Government of Virgin Islands v. Toto*, 529 F.2d 278 (3d Cir. 1976), where evidence of a prior crime committed by the accused was inadvertently brought to the jury's attention, and the district court had attempted to fashion a curative instruction. The court stated:

> [W]e unerringly refuse to admit evidence of prior criminal acts which has no purpose except to infer a propensity or disposition to commit crime. When such evidence reaches the attention of the jury, it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence. A drop of ink cannot be removed from a glass of milk.
> [citations omitted]

*Id.* at 283. *See also Price v. State*, 590 P.2d 419 (Alaska 1979) (admission of other crime was harmless error); *Post v. State*, 580 P.2d 304 (Alaska 1978) (admission was harmless error); *Gould v. State*, 579 P.2d 535 (Alaska 1978); *Eubanks v. State*, 516 P.2d 726 (Alaska 1973).

missible information regarding the accused, was prejudicial error.

## V. PROSECUTORIAL DISCRETION TO CHARGE MANSLAUGHTER OR CARELESS USE OF A FIREARM

Keith contends that on the facts of this case his conviction must be overturned as a violation of his constitutional equal protection and due process rights.[28] The basis for his claim is that the legislature had provided two statutes which proscribed the same conduct: careless use of firearms, AS 11.-15.200, which was a misdemeanor, and manslaughter, AS 11.15.040, which was a felony.

 The manslaughter statute on which Keith's conviction is based stated:

> *Manslaughter.* Except as provided in §§ 10–30 of this chapter, a person who unlawfully kills another is guilty of manslaughter, and is punishable by imprisonment in the penitentiary for not less than one year nor more than 20 years.[29]

The careless use statute which is at issue in this case provided in part:

> *Careless use of firearms.* (a) A person who intentionally, and without malice, points or aims a firearm at or toward a person, or discharges a firearm so pointed or aimed at a person, or points and discharges a firearm at or toward a person or object without knowing the identity of the object and maims or injures a human being, is guilty of the careless use of

firearms, and upon conviction is punishable by a fine of not more than $1,000, or imprisonment for not more than one year, or by both. . . .

> (b) If death ensues from the maiming or injuring, the person discharging the firearm may, in the discretion of the prosecuting officer or grand jury, be charged with the crime of manslaughter.

> (c) This section does not apply to a case where firearms are used in self-defense or in the discharge of official duty, or in case of a justifiable homicide.[30]

Keith's contention is that section (b) of the careless use statute vests impermissible discretion in the prosecutor to charge either manslaughter or careless use of firearms whenever a death results from an act which is a violation of the careless use statute. According to appellant, this situation exists because the two statutory offenses include precisely the same elements of criminality where death results from the use of the firearm. Under this interpretation of the careless use of firearms statute, appellant argues the degree of prosecutorial discretion involved raises "serious questions of improper prosecutorial discretion and violation of equal protection."[31] However, this court has a duty to construe statutory provisions, whenever possible, to avoid the dangers of unconstitutionality.[32] In this case, the court must construe both the manslaughter statute and the careless use of firearms statute.

---

**28.** United States Const. amends. V & XIV; Alaska Const. art. I, §§ 1 & 7. *See also Bell v. State*, 598 P.2d 908, 913 (Alaska 1979). As in *Bell*, we focus our analysis on the equal protection arguments since that is the one upon which Keith primarily relies.

**29.** AS 11.15.040, as set forth at the time of the offense.

**30.** AS 11.15.200, as set forth at the time of the offense.

**31.** *Christie v. State*, 580 P.2d 310, 319 n.29 (Alaska 1978). *See also Berra v. United States*, 351 U.S. 131, 135–40, 76 S.Ct. 685, 688–691, 100 L.Ed. 1013, 1018–21 (1956) (Black and Douglas, JJ., dissenting); *Bell v. State*, 598 P.2d 908 (Alaska 1979); *State v. G.L.P.*, 590 P.2d 65, 71 (Alaska 1979) (Rabinowitz, J., and Boochever, C. J., dissenting); *Mohn v. State*, 584 P.2d 40, 43 n.10 (Alaska 1978); *State v. Erickson*,

574 P.2d 1, 18–19 n.112 (Alaska 1978); *People v. Calvaresi*, 188 Colo. 277, 534 P.2d 316, 318 (1975). *See generally* Berger, *Equal Protection and Criminal Sentencing: Legal and Policy Considerations*, 71 Nw.L.Rev. 29, 46–47 (1976). As this court stated in *Anderson v. State*, 562 P.2d 351, 356 (Alaska 1977), in a slightly different context: "[Undue discretion in the prosecuting authorities] can lead to arbitrary enforcement against persons who, due to their particular life styles or other factors, incur the ire of those empowered to determine who shall be prosecuted."

**32.** *Christie v. State*, 580 P.2d 310, 319 n.29 (Alaska 1978); *Larson v. State*, 564 P.2d 365, 371–72 (Alaska 1977); *State v. Martin*, 532 P.2d 316, 321 (Alaska 1975); *Hoffman v. State*, 404 P.2d 644, 646 (Alaska 1965).

At the time of the offense, AS 11.15.040 made any "unlawful killing," except one which constitutes murder in the first or second degree, manslaughter.[33] The statute contained no listing of factors which constitute the crime of manslaughter;[34] however, it was generally recognized that "unlawful killing" meant either a voluntary act, but without malice, as upon a sudden heat of passion, or an involuntary act, done in the commission of some unlawful act.[35] In contrast to most jurisdictions,[36] the manslaughter statute in Alaska drew no distinction between the punishment of voluntary and involuntary manslaughter.[37] Alterna-tively, manslaughter could be committed through "[the] killing of a human being by the culpable negligence of another,"[38] when the killing did not contain the elements of first or second degree murder, and was not justifiable[39] or excusable.[40]

The state contends that a manslaughter conviction is appropriate anytime the state can prove that a violation of a misdemeanor statute, in this case careless use of firearms, has occurred and a death was proximately caused by the violation.[41] This position is termed the misdemeanor-manslaughter doctrine by the commentators and enjoys wide acceptance in other jurisdictions.[42] In *Gray*

33. *United States v. Barbeau*, 92 F.Supp. 196 (D.Alaska 1950), aff'd, 193 F.2d 945 (9th Cir. 1951); *Johnson v. State*, 511 P.2d 118, 124 n.10 (Alaska 1973); *Jennings v. State*, 404 P.2d 652, 655 (Alaska 1965).

34. *Johnson v. State*, 511 P.2d 118, 124 n.10 (Alaska 1973).

35. *United States v. Barbeau*, 92 F.Supp. 196 (D.Alaska 1950), aff'd, 193 F.2d 945 (9th Cir. 1951); *Stork v. State*, 559 P.2d 99, 100 (Alaska 1977); *Gray v. State*, 463 P.2d 897, 906 (Alaska 1970). *See generally* 1 R. Anderson, Wharton's Criminal Law and Procedure § 272, at 577 (1957 and Supp. 1977).

36. *See generally*, R. Perkins, Criminal Law, at 51 (2d ed. 1969); 1 R. Anderson, Wharton's Criminal Law and Procedure § 272, at 577 (1957 and Supp. 1977).

37. *Des Jardins v. State*, 551 P.2d 181 (Alaska 1976); *Jennings v. State*, 404 P.2d 652, 655 (Alaska 1965).

38. AS 11.15.080, as set forth at the time of the offense. Though the Alaska statute on negligent homicide is set out separately from the general definition of manslaughter in AS 11.15.-040, this court has held that there is nevertheless only one statutory crime of manslaughter. *Des Jardins v. State*, 551 P.2d 181, 188 (Alaska 1976). *See also United States v. Barbeau*, 92 F.Supp. 196 (D.Alaska 1950), aff'd, 193 F.2d 945 (9th Cir. 1951).

39. At the time of the offense, AS 11.15.100 embodied the self-defense and defense of others exception to the manslaughter statute. It provided:

*Justifiable homicide.* The killing of a human being is justifiable when committed by any person
(1) to prevent the commission of a felony upon him or upon his [sic] husband, wife, parent, child master, mistress or servant;
(2) to prevent the commission of a felony upon his property, or upon property in his possession, or upon or in a dwelling house where he may be;
(3) in the attempt, by lawful means, to arrest a person who has committed a felony, or in the lawful attempt to suppress a riot or preserve the peace.

40. At the time of the offense, AS 11.15.110 provided:

*Excusable homicide.* The killing of a human being is excusable when committed (1) by accident or misfortune in lawfully correcting a child, or in doing any other lawful act, by lawful means, with usual and ordinary caution and without unlawful intent; or
(2) by accident or misfortune in the heat of passion, upon a sudden and sufficient provocation, or upon a sudden combat, without premeditation or undue advantage being taken, and without a dangerous weapon or thing being used, and not done in a cruel or unusual manner.

41. This construction of the statutes was adopted by the superior court in its instructions to the jury.

42. This misdemeanor-manslaughter doctrine has never been expressly adopted by this court. In *Stork v. State*, 559 P.2d 99, 100 (Alaska 1977), however, we quoted, without criticism, a jury instruction which defined manslaughter as follows:

Manslaughter embraces a killing without malice or intent, in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily injury . . . . It is the unlawful killing of a human being without intent to kill or inflict the injury causing death, committed accidentally in the commission of some unlawful act not felonious . . . .

The *Stork* case was reversed on the basis of a separate error in the instruction dealing with negligent homicide.

*v. State*, 463 P.2d 897, 906 (Alaska 1970), we held that a killing done in the perpetration of a felony, but without a specific intent or purpose to kill, constitutes manslaughter. This is, in a sense, a felony-manslaughter rule and appears to be a rather distinctive homicide scheme.

This court has never previously directly considered whether the misdemeanor-manslaughter doctrine is encompassed in the "unlawful killing" language of AS 11.15.-040. This question is of significance to the present case because the jury was instructed on a misdemeanor-manslaughter theory, namely, that commission of all the elements of careless use of firearms with a death resulting, constituted manslaughter.

In *Christie v. State*, 580 P.2d 310, 319 (Alaska 1978), this court interpreted the careless use statute as providing three ways in which it can be violated. The types of prohibited conduct were:

 1. Intentionally, and without malice, pointing or aiming a firearm at or toward a person;

 2. [Unintentionally] [d]ischarging a firearm which is pointed or aimed, intentionally and without malice, at a person;

 3. Pointing and discharging, without malice, a firearm at or toward a person or object without knowing the identity of the object and maiming or injuring a human being. [footnote omitted]

*Id.* Under the state's theory of this case, a violation of any of the prohibited conduct which resulted in a death would be manslaughter.[43] But resolution of Keith's prosecutorial discretion claims is complicated by the express statutory language of the careless use statute which, in part, specifically provided:

If death ensues from the maiming or injury, the person discharging the firearm may, in the discretion of the prosecuting officer or grand jury, be charged with the crime of manslaughter.[44]

Keith contends that this provision of AS 11.15.200(b) introduced an impermissible element of discretion in the prosecuting authority to charge a felony, manslaughter, or a misdemeanor, careless use of firearms, for the same conduct. We disagree for the following reasons.

First, it should be noted that, by its express terms, the discretion-to-charge provision applies only to the third type of conduct listed above as an act contravening the careless use statute.[45] Thus, we think it notable that the legislature ascribed significance and accorded special statutory treatment to a killing which results from the pointing and discharging of a firearm not knowing the identity of the object it is pointed at and as result wounding or maiming a person. This is the only type of conduct under the careless use statute which requires actual injury to a human being for conviction of careless use. We think this indicates a legislative judgment that the type of behavior proscribed in (3) above is less culpable than an intentional pointing of a firearm at a person, even where no killing results. Thus, we conclude that a reasonable construction of former AS 11.15.200 is to find that the conduct in (1) and (2) above, essentially an intentional pointing and an intentional discharge of a firearm, if it results in death, is manslaughter. In essence, we hold that the misdemeanor-manslaughter doctrine was encom-

---

43. This misdemeanor-manslaughter doctrine applied to the case at bar would cause no problem with prosecutorial discretion in charging Keith because the only crime which could be charged would be manslaughter. Further, under the doctrine, Keith would not be entitled to a lesser included offense instruction on careless use of firearms because the so-called greater offense (manslaughter) would not require the jury to find any disputed fact not also required for conviction of the lesser included offense (careless use). *See Rice v. State*, 589 P.2d 419, 420 (Alaska 1979).

44. AS 11.15.200(b), as set forth at the time of the offense.

45. Only conduct involving a pointing and discharging of a firearm at an unidentified object, which turns out to be a person, requires a "wounding or maiming" element to constitute careless use of a firearm under former AS 11.-15.200. *See Christie v. State*, 580 P.2d 310, 319 (Alaska 1978).

passed within the "unlawful killing" phraseology of AS 11.15.040, Alaska's former manslaughter statute. We further hold that in regard to this misdemeanor-manslaughter rule the conduct proscribed in the first two portions of the careless use statute, if death results, constitutes manslaughter under this doctrine.[46] As a result, we find no violation of equal protection because the misdemeanor statute sets forth the particular application of this doctrine. The statutes do not proscribe the same conduct because manslaughter under this provision requires the additional element of death of the victim.

## VI. SUPERIOR COURT'S FAILURE TO INSTRUCT ON CULPABLE NEGLIGENCE, CONTRIBUTORY NEGLIGENCE, AND THE GIVING OF AN INSTRUCTION CONCERNING CARELESS USE OF FIREARMS

The jury was given several instructions on manslaughter. It was first instructed:

Manslaughter is the unlawful killing of another human being. The crime of manslaughter is distinguished from murder, in any degree, in that proof of malice and purpose are not required.

The jury was further instructed:

The word "unlawfully" means wrongfully or contrary to law. Hence, to do an act unlawfully means to do willfully something which is contrary to law.

Under the instructions given, the only "unlawful" act which the jury was advised of was the careless use of firearms statute.

At the time of the offense, AS 11.15.200 provided, in pertinent part, as follows:

(a) A person who intentionally, and without malice, points or aims a firearm at or toward a person, or discharges a firearm so pointed or aimed at a person is guilty of careless use of firearms . . .
(b) If death ensues from the maiming or injuring, the person discharging the firearm may, in the discretion of the prosecuting officer or grand jury, be charged with the crime of manslaughter.

Finally, the jury was instructed:

When the state bases a charge of Manslaughter upon the violation of a statute it must show that such violation was the proximate cause of the homicide.

Proximate cause was also further defined for the jury. However, no instructions were given on culpable negligence or contributory negligence, even though instructions on those subjects were requested by Keith's trial counsel. Careless use of firearms was not designated a lesser included offense of manslaughter in the instructions.

Keith contends that the instruction on careless use of firearms was erroneous, and that the superior court further erred in failing to give his requested instructions on culpable negligence and contributory negligence.[47]

Given our holding regarding the proper construction of the careless use of firearms statute, we conclude that this specification of error is without merit. Under the construction we have adopted today if a viola-

**46.** We note that Alaska's new criminal code, which became effective on January 1, 1980, totally abandons the unlawful act approach to manslaughter and contains no misdemeanor-manslaughter provisions. *See* AS 11.41.120.–130. W. LaFave and A. Scott, Criminal Law at 602 (1972), have criticized the misdemeanor-manslaughter doctrine at length. For an example of an alternative approach to the misdemeanor-manslaughter doctrine, see A.L.I., Model Penal Code §§ 210.0–.4 (Approved Draft 1962).

**47.** Applying the construction we have adopted of the careless use statute to the specific instructions given in this case, it is apparent that the instruction regarding the elements of the

careless use of firearms statute was an incorrect statement of the law. The instruction failed to distinguish between (1) intentional pointing of a firearm at a person, or discharge of a firearm so pointed and (2) intentional pointing of a firearm at a human being, i. e., pointing it at an object not identified, discharging it, and wounding or maiming a person as a result of the discharge. Contrary to what the instruction indicates, where there is an intentional pointing the crime of careless use of firearms is complete without the necessity for any injury; indeed, there need not even be a discharge of the weapon. *See Christie v. State,* 580 P.2d 310, 319 (Alaska 1978).

tion of the intentional pointing/unintentional discharge portion of the careless use statute is found, a misdemeanor-manslaughter conviction automatically results if the victim is killed. The only way the jury in this case could have arrived at a manslaughter conviction, assuming it followed the instructions given by the superior court, is if it found an intentional pointing and an unintentional discharge of the firearm. Thus, although the instruction incorrectly required the jury also to find a wounding or maiming in addition to the pointing, a finding of injury would not negate the need to find the other elements of the crime. The fact of death was not in dispute in this case.[48] Thus, there was no error in not instructing the jury on culpable negligence or the lesser included offense of careless use of firearms.

Reversed and Remanded for new trial.

---

48. *See Des Jardins v. State*, 551 P.2d 181, 188 (Alaska 1976) and *Jennings v. State*, 404 P.2d 652, 655 (Alaska 1965), which both involved the trial court's separation of manslaughter into voluntary and involuntary manslaughter, contrary to the law of Alaska. However, since the jury instructions defining involuntary manslaughter in all other respects conformed to the law as to manslaughter in Alaska, the convictions for manslaughter obtained in these cases were affirmed. *See also Bendle v. State*, 583 P.2d 840, 843–44 n.4 (Alaska 1978) (when the jury returns a special interrogatory indicating its belief that a defendant is guilty of a crime on more than one theory, then even though error may be found as to one theory, the general verdict will be upheld if an alternative theory of conviction is sound).